UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RONALD MANN,<br><br>          Plaintiff,<br><br>v.<br><br>AMICA MUTUAL INSURANCE COMPANY,<br><br>          Defendant. | Civil Action No. 1:23-cv-00534<br><br>**Jury Trial Demanded** |

**COMPLAINT**

Plaintiff Ronald Mann, through his undersigned counsel, hereby brings this Complaint against his former employer Amica Mutual Insurance Company ("Amica") based upon Amica's discriminatory and retaliatory termination of Mr. Mann due to his religion and complaints he made about discrimination. As a result, Mr. Mann has suffered from severe emotional distress, lost wages and benefits, and lost future wages and benefits. In support of this complaint, Mr. Mann avers as follows:

**Parties**

1. Mr. Mann is a citizen of Rhode Island and resides at 14 Garden City Drive, Cranston, RI 02920.

2. Amica is a Mutual Insurance Company headquartered at 100 Amica Way, Lincoln, RI 02865 with a principal place of business located at P.O. BOX 6008, Providence, RI 02940.

**Facts**

3. Mr. Mann was hired by Amica in February of 2019 as a Senior Marketing Analyst earning $75,000 per year.

4. In Mr. Mann's 2019 performance review, he received an overall rating of "Achieves" which meant that he "consistently achieves requirements in all key areas" and that his performance was "reflective of a fully qualified individual in this position."

5. In Mr. Mann's 2020 performance review, he received an overall rating of "Outstanding," the highest possible rating, which meant that he "consistently and significantly exceeds requirements and expectations in all key areas," and that his "contributions have a significant impact and value to the department and/or the organization."

6. In April of 2021, Mr. Mann was promoted to the role of Lead Market Researcher.

7. In Mr. Mann's 2021 performance review, he received an overall rating of "Exceeds" which meant that he "consistently exceeds requirements in all key areas" and that his performance was "exceptional with minimal supervision."

8. During his time working for Amica, Mr. Mann received the above reviews and promotion and realized an above average compound annual base salary growth rate of 8.1%.

9. Mr. Mann's direct supervisor, Yiguang Qiu, has consistently praised Mr. Mann's performance and, just days before Mr. Mann was fired, was discussing another promotion with him after his successful project management of an important new advertising agency search process.

10. On November 1, 2022, Mr. Mann attended a work-related dinner with approximately 20 individuals including several Amica employees and Jim Arslan, Vice President at EXL Marketing Services, a large Amica vendor.

11. During the dinner, Mr. Arslan was telling a story and loudly stated, "like a typical Brooklyn Jew." Mr. Mann, who is Jewish, ignored the comment during the dinner to avoid any uncomfortableness and ensure that the dinner remained professional and cordial.

12. After the dinner, and after most of the guests had left, Mr. Mann approached Mr. Arslan and respectfully commented that he took offense to his use of the phrase, "like a typical Brooklyn Jew."

13. Mr. Mann noted that antisemitism was clearly on the rise and various mainstream artists and athletes, including Dave Chappelle, Kanye West, and Kyrie Irving had recently made comments that have emboldened anti-Semites throughout the country.[1]

14. Mr. Mann explained that although he knew that Mr. Arslan was also Jewish, he believed that such a comment would only further invite antisemitism and continue to make it more acceptable among the general public.

15. Mr. Arslan responded by physically grabbing Mr. Mann's neck and loudly asserting that he was incapable of being anti-Semitic because he is Jewish.

16. Dr. Qiu witnessed Mr. Arslan's physical attack of Mr. Mann and, in connection with proceedings before the Rhode Island Commission for Human Rights (the "Commission"), confirmed it took place.

17. Mr. Mann calmly stepped back and respectfully stated that he disagreed and that none of the other present individuals were Jewish.

---

[1] Numerous news outlets reported on the record high number of anti-Semitic incidents as of November of 2022. See https://www.pbs.org/newshour/show/antisemitic-incidents-hit-a-record-high-in-2021-whats-behind-the-rise-in-hate; https://www.npr.org/2022/11/01/1133041108/how-to-confront-rising-antisemitism-in-the-u-s; https://www.washingtonpost.com/religion/2022/10/27/antisemitism-kanye-trump-adidas-jews/; https://www.nytimes.com/2022/11/04/us/kanye-antisemitism-midterms.html. As of today, antisemitism has reached a historic level in the United States. https://www.cnn.com/2023/10/31/politics/fbi-director-antisemitism-wray/index.html; https://www.cbsnews.com/news/antisemitic-incidents-spike-following-hamas-attack-israel-anti-defamation-league/.

18. During Mr. Arslan's loud and physical reaction, Michael Plante, a Senior Associate Vice President of Marketing, and Tory Pachis, the Vice President of Marketing, intervened and asked Mr. Mann if there was anything they could do.

19. Mr. Mann, hoping to quickly defuse the issue, calmly and respectfully said, "No thanks, I've got this" or words to that effect.

20. Mr. Plante nor Mr. Pachis left the area and never made any further attempt to intervene.

21. The conversation soon ended and the few remaining people at the dinner left.

22. Neither Mr. Plante nor Mr. Pachis said a single word to Mr. Mann about the incident.

23. Mr. Mann planned to discuss this incident with Dr. Qiu and Mr. Pachis the following day.

24. The following morning while Mr. Mann was driving to work, Mr. Arslan emailed Mr. Mann and asked if they could speak to "clear the air." Mr. Mann agreed and scheduled a call with Mr. Arslan for approximately 4:30 p.m.

25. Upon Mr. Mann's arrival at the Amica office, he noticed that Mr. Pachis seemed to be purposefully avoiding him. Mr. Mann found it odd that Mr. Pachis did not initiate a conversation about what had taken place considering the nature of the comment made by Mr. Arslan, the offense Mr. Mann took, and the physicality by Mr. Arslan.

26. Mr. Mann knew that Mr. Pachis considered Mr. Arslan a very valuable vendor[2] but did not believe that his discriminatory comment or Mr. Mann's offense should be ignored.

27. As such, at mid-day, Mr. Mann went to Mr. Pachis's office to discuss the event and see what steps, if any, Mr. Pachis intended to take.

28. Mr. Pachis claimed that he did not know what happened or why and simply stated that he believed that Mr. Mann "could have handled it better."

29. Mr. Mann explained that he was deeply offended by Mr. Arslan's comment and waited until after the dinner was over to speak with him and did so in a respectful and professional manner.

30. Mr. Pachis made no attempt to hide his beliefs that Mr. Mann was being overly-sensitive and that Mr. Arslan was extremely important to Amica.

31. As such, when he half-heartedly asked Mr. Mann if he wanted to file a formal complaint with Human Resources or have him escalate the issue with Mr. Arslan's boss, Mr. Mann responded that perhaps he should first speak with Mr. Arslan (as he requested) and see if the issue could first be handled directly before taking any other steps.

32. Importantly, Mr. Pachis agreed with this course of conduct and at no time directed Mr. Mann to not speak with Mr. Arslan.

33. At approximately 4:30 p.m., Mr. Mann spoke with Mr. Arslan. Although Mr. Arslan did not apologize, he did state that he had "learned something new."

34. Curiously, Mr. Arslan noted that he had spoken with Mr. Pachis at 7:30 that morning (despite Mr. Pachis's feigned ignorance about what had transpired the night before)

---

[2] Amica is heavily reliant on direct mail marketing to prospective customers and exclusively utilizes EXL for that purpose. While EXL is a vendor, Amica is reliant on their services and Mr. Pachis deeply values their relationship.

and cryptically stated that he had told Mr. Pachis that Mr. Mann had "a lot of chutzpah[3] to say something to me and put his career on the line" but that he did not want Mr. Mann "to lose his job over this."

35. Mr. Mann was obviously confused by this comment since it was Mr. Arslan who had made the offensive comment and physically touched Mr. Mann during the conversation.

36. But because of EXL's relationship with Amica, Mr. Arslan clearly believed he had significant leverage over Amica and Mr. Mann.

37. Mr. Mann, now afraid to further escalate the issue with Mr. Pachis due to Mr. Arslan's threat and Mr. Pachis's clear disinterest in taking any action whatsoever, decided he would speak with Dr. Qiu to obtain further guidance about how to best handle the issue.

38. The following day, November 3, 2022, Mr. Mann spoke with Dr. Qiu about the incident, Mr. Arslan's threat, and Mr. Pachis's reaction to Mr. Mann's complaint.

39. Dr. Qiu told Mr. Mann that he had spoken with Mr. Pachis and that Mr. Pachis had stated that he wanted to fire Mr. Mann.

40. Dr. Qiu, who was also present at the dinner, reported that he told Mr. Pachis that he did not have any cause to fire Mr. Mann since his performance had been excellent and that he had been a "victim" of Mr. Arslan's.

41. Dr. Qiu, who had only days before represented that he was looking to promote Mr. Mann again, directed Mr. Mann to "keep his head down" for a while.

---

[3] Chutzpah is Yiddish for "insolence, gall, imprudence, or audacity."

42. Mr. Mann, again confused as to what he did wrong and now fearful for his job, agreed. He never raised the issue again and heard nothing from anyone regarding the incident for the next couple of weeks.

43. At this point, Mr. Mann assumed that the issue was over. He was wrong.

44. Instead of investigating Mr. Arslan's comment and physical attack, Amica purportedly began investigating Mr. Mann.

45. Upon information and belief, Amica interviewed various Amica employees (many of whom were not at the dinner) in an effort to obtain allegations that could provide rationale to fire Mr. Mann.

46. On November 14th, Amy Carosi, Assistant Vice-President of Human Resources, called Mr. Mann into her office and terminated him.

47. Ms. Carosi refused to provide any rationale for the termination until several days later when she told him, via email, that he had been fired for "a pattern of unprofessionalism."

48. Ms. Carosi explained that Mr. Mann had been reprimanded in February of 2022 after his wife, unaware that Mr. Mann was participating in a Zoom meeting, briefly displayed her breasts.

49. Despite the fact that Mr. Mann had not himself engaged in any unprofessional behavior and was obviously mortified by what had happened, according to Ms. Carosi, the written reprimand "outlined that any future instances of unprofessionalism could be grounds for immediate termination. Given the recent additional incidents in which you displayed unprofessional behavior following that warning, we made the decision to terminate your employment."

50. The only "recent" "incident" of any kind had been the November 1st dinner and the November 2nd meetings with Mr. Pachis and Dr. Qiu.

51. During all of these "incidents", Mr. Mann behaved in a professional manner.

52. His sole alleged "misdeed" was simply advising Mr. Arslan that he took offense to the remark and then seeking counsel from Mr. Pachis and Dr. Qiu about how they intended to handle the issue.

53. Confronted with an employee who had been the victim of an anti-Semitic comment and complained to him about the incident, Mr. Pachis elected to terminate that employee for taking offense and for coming to speak with him about the comment and his belief that it was discriminatory.

54. Amica's claim that Mr. Mann was fired for unprofessionalism is mere pretext.

55. Mr. Mann's personnel file contains zero references to any unprofessionalism on his part.

56. His reviews were excellent, he was promoted and given raises, and he was being recommended for another promotion at the time of his termination.

57. In addition, Mr. Mann has obtained sworn statements from a former employee of an Amica vendor and two former Amica employees (both of whom sat next to Mr. Mann) all attesting to Mr. Mann's positive character and behavior while employed by Amica.

58. Instead, Amica fired Mr. Mann because of his race and religion and because he complained to Amica about having been the victim of a discriminatory insult.

59. Because of Amica's actions, Mr. Mann has suffered from lost wages, lost benefits, emotional distress, and physical injury and sickness.

60. He is unable to provide for his family because he was fired because of his race and religion and because he took offense to an anti-Semitic comment.

61. The actions by Amica as detailed herein were arbitrary, unreasonable, tortious, willful, wanton, reckless and in bad faith.

62. Despite diligent attempts to secure a job, Mr. Mann is still unemployed.

63. On February 9, 2023, Mr. Mann filed a written charge of discrimination against Amica (the "RICHR Complaint") with the Commission. The Commission filed the RICHR Complaint with the United States Equal Employment Opportunity Commission (the "EEOC").

64. On October 4, 2023, the Commission issued a notice of right to sue (the "RICHR Notice of Right to Sue") terminating the proceedings before the Commission and authorizing Mr. Mann to file suit under state law.

65. On November 2, 2023, the EEOC issued a dismissal and notice of rights (the "EEOC Dismissal") terminating the proceedings before the EEOC and authorizing Mr. Mann to file suit under federal law.

## COUNT I
### (Fair Employment Practices Act – R.I. Gen. Laws § 28-5-1, *et seq*.)

66. Mr. Mann repeats and realleges Paragraphs 1-65 as if set forth in full herein.

67. Mr. Mann is an employee as that term is defined by R.I. Gen. Laws § 28-5-6.

68. Amica is an employer as that term is defined by R.I. Gen. Laws § 28-5-6.

69. It was an unlawful employment practice for Amica to terminate Mr. Mann because of his race and religion and because he complained about Mr. Arslan's anti-Semitic comment.

70. As a result of these violations of law as described herein, Mr. Mann has suffered and continues to suffer damages.

## COUNT II
### (RI Civil Rights Act of 1990 – R.I. Gen. Laws § 42-112-2)

71. Mr. Mann repeats and realleges Paragraphs 1-70 as if set forth in full herein.

72. Amica terminated Mr. Mann because of his race and religion and because he complained about Mr. Arslan's anti-Semitic comment

73. As a result of these violations of law as described herein, Mr. Mann has suffered and continues to suffer damages.

## COUNT III
### (Title VII of the Civil Rights Act of 1964 - 42 U.S.C. § 2000e, et seq.)

74. Mr. Mann repeats and realleges Paragraphs 1-73 as if set forth in full herein.

75. Amica is an employer as that term is defined by 42 U.S.C. § 2000e-1.

76. Mr. Mann is an employee as that term is defined by 42 U.S.C. §2000e-1.

77. It was an unlawful employment practice for Amica to terminate Mr. Mann because of his race and religion and because he complained about Mr. Arslan's anti-Semitic comment.

78. As a result of these violations of law as described herein, Mr. Mann has suffered and continues to suffer damages.

## COUNT IV
### (RI Whistleblowers' Protection Act – R.I. Gen. Laws § 28-50-1, *et seq.*)

79. Mr. Mann repeats and realleges Paragraphs 1-78 as if set forth in full herein.

80. Mr. Mann is an employee as that term is defined by R.I. Gen. Laws § 28-50-2.

81. Amica is an employer as that term is defined by R.I. Gen. Laws § 28-50-2.

82. Amica discharged, threatened, and otherwise retaliated against Mr. Mann because he reported to Amica violations of federal and state law.

83. The actions and omissions about which Mr. Mann complained violated state and/or federal law.

84. In the alternative, Mr. Mann reasonably and in good faith believed those actions and omissions violated state and/or federal law.

85. As a result of these violations of law as described herein, Mr. Mann has suffered and continues to suffer damages.

RONALD MANN

By His Attorney,

ENRIGHT LAW LLC

/s/ Thomas J. Enright
Thomas J. Enright (#7356)
696 Reservoir Avenue
Cranston, RI 02910
(401) 526-2620
(401) 457-7117  FAX
tom@enrightlawoffice.com

DATED: December 15, 2023